# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EDWARD CIOCIOLA,

        Plaintiff,

    v.                                   Case No. 06-C-00255

HARLEY-DAVIDSON INC. and
HARLEY-DAVIDSON MOTOR
COMPANY, INC.,

        Defendants.

---

## DECISION AND ORDER

---

### I.  PROCEDURAL  AND FACTUAL BACKGROUND

On March 3, 2006, the plaintiff, Edward Ciociola ("Ciociola"), filed a complaint alleging that the defendants, Harley-Davidson Inc. ("H-D, Inc.") and Harley-Davidson Motor Company, Inc. ("Harley-Davidson"), infringed on Ciociola's scarecrow service marks by incorporating and using these marks in the marketing and sale of its motorcycles and motorcycle parts and accessories. Ciocola asserts that the defendants' use of his service marks constitutes false designation of origin, sponsorship and/or affiliation, and unfair competition in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

Currently pending before the court is the defendants' motion for summary judgment which is fully briefed and is ready for resolution.  For the reasons which follow, the defendants' motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendants' motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendants' motion for summary judgment contained responses to the defendants' proposed findings of fact as well as some additional proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendants' motion for summary judgment.

H-D, Inc. is a Wisconsin corporation with its principal corporate office located at 3700 W. Juneau Avenue, Milwaukee, Wisconsin. (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 4.) Harley-Davidson is a Wisconsin corporation with its principal corporate office located at 3700 W. Juneau Avenue, Milwaukee, Wisconsin. (DPFOF ¶ 5.)

Harley-Davidson has been manufacturing and selling Harley-Davidson motorcycles since 1903. (DPFOF ¶ 6.) Harley-Davidson, at all times relevant to this suit, offers a wide variety of products and services relating to its motorcycles, including parts, accessories, and custom paint sets. (DPFOF ¶ 7.)

Ciociola is self-employed as a free-hand paintbrush artist specializing in the detailing of motorcycles. (DPFOF ¶ 16.) Ciociola resides in Wisconsin. (DPFOF ¶ 1.)

Ciociola has used the word "Scarecrow" to identify the freehand painting and detailing services he has provided to motorcycle owners and others since July 1980.[1] (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 1; DPFOF ¶ 130.) Ciociola will normally place a version of the

_____

[1]The defendants object to the plaintiff's proposed use of the term scarecrow "word mark," on the grounds that it is a legal conclusion that Ciociola has an enforceable trademark right in certain words or images.

2

scarecrow design on all motorcycles he paints. The scarecrow design/artwork placed on each motorcycle is consistent in appearance, such as facial features, colors used, and style of dress, but is usually depicted in different poses or activities.[2] (PPFOF ¶ 2.)

Ciociola provides his services at Honda and Harley-Davidson Dealers' showrooms, Harley-Davidson sponsored/sanctioned motorcycle events, Harley Owners Group ("H.O.G.") sponsored/sanctioned motorcycle events, and the plaintiff's studios in Wisconsin and North Carolina. (PPFOF ¶ 3.) H.O.G. has nearly a million members, and is the largest factory-sponsored motorcycle organization in the world. (PPFOF ¶ 5.) Harley-Davidson heavily markets to H.O.G. to promote the Harley-Davidson "lifestyle" and products. (PPFOF ¶ 6.) One or more of Harley-Davidson's corporate affiliates sponsor various national, state, and touring rallies for members of H.O.G. at which Harley-Davidson's products are showcased. In prior years vendors were allowed to provide their goods and services to H.O.G. member rally participants by invitation. Currently, no vendors other than Harley-Davidson's corporate affiliates are permitted inside of H.O.G. rally venues, but other vendors may be allowed to participate outside the venue. (PPFOF ¶ 7.)

Ciociola has painted between 15,000 and 22,000 motorcycles since 1980. (PPFOF ¶ 8.) Ciociola has provided his services at over 400 motorcycle dealerships since 1980. (PPFOF ¶ 9.) Ciociola normally makes 18 to 20 appearances per year at rallies and dealerships to provide his services. (PPFOF ¶ 10.) Plaintiff may paint as many as ten (10) motorcycles in a day at an event, and he charges between $10 and $5,000 for his custom work. (DPFOF ¶ 125.)

_____

[2]In order to aid the reader in visualizing Ciociola's scarecrow design, a version of Ciociola's scarecrow design from his website can be found in Appendix 1.

3

Ciociola has attended the annual Harley-Davidson sponsored motorcycle rally at Sturgis, South Dakota since 1996. (PPFOF ¶ 12.) Attendance at the Sturgis rally usually exceeds 500,000 people. (PPFOF ¶ 13.) Since 1996, Ciociola has attended Harley-Davidson/H.O.G. sponsored state rallies in Colorado, Georgia, Wisconsin, Illinois, Indiana, Kansas, Louisiana, New Jersey, Missouri, South Carolina, and Virginia. (PPFOF ¶ 14.) The parties dispute whether Ciociola is a "Harley approved vendor." (PPFOF ¶ 15; Def.'s Resp. to PPFOF ¶ 15.)

Ciociola attends every Harley-Davidson, H.O.G., and dealer event using the scarecrow word and design. His booth for such events has always incorporated signs using both the scarecrow word and design. (PPFOF ¶ 18.) Plaintiff does not specifically advertise his dealer appearances, although certain dealers may advertise his appearances using the word "Scarecrow" or the design in local papers. (DPFOF ¶ 131.)

Ciociola maintains a current mailing list of over 4,000 customers to which he mails promotional materials and schedules on a yearly basis. (PPFOF ¶ 19.) Since 1980, Ciociola has consistently used business cards, letterhead, invoices, and other such documents to promote his services utilizing the scarecrow word and design. (PPFOF ¶ 20.)

Dealers often publicize Ciociola's appearance at a dealer event by placing display ads in newspapers. (PPFOF ¶ 23.) Ciociola will send postcards to existing customers to advise them of an upcoming appearance at a local dealership. (PPFOF ¶ 24.) Some dealers and customers do not know the plaintiff as Ed Ciociola, but as "Scarecrow."[3] (PPFOF ¶ 25.)

---

[3]The parties dispute how many dealers and customers know Ciociola as "Scarecrow." Ciociola asserts that "[m]any dealers and the majority of customers" know him as "Scarecrow." Although Ciociola has presented evidence that at least some dealers and customers know his as "Scarecrow," it is unclear whether this constitutes "many" or the "majority."

4

Ciociola places a version of his scarecrow design on every motorcycle he paints. (PPFOF ¶ 26.) Since 1998, Ciociola has maintained a web site at www.scarecrowart.com to promote his work and to post appearance schedules and other information. This website has had over 560,000 hits since its inception. (PPFOF ¶ 27.)

Ciociola has been filmed painting motorcylces or other vehicles for television news stories produced by local network affiliates approximately ten times, including local affiliate stations in Kansas, Chicago, and Pennsylvania. (PPFOF ¶ 28.) Ciociola has had newspaper articles written about him between 10 and 20 times. These articles typically refer to him as "Scarecrow" and highlight his work. (PPFOF ¶ 29.) If someone conducts a Google search of the internet ten times with the words "motorcycle and scarecrow," Ciociola website "www.scarecrowart.com" is returned first and second on each occasion. (PPFOF ¶ 30.)

A key component of Ciociola's offering is that the customer can watch him work, and he invites people to watch him work. (DPFOF ¶ 121.) Ciociola does not pre-paint motorcycles or motorcycle parts, and he only works on motorcycles owned by customers or dealerships. (DPFOF ¶ 122.) Ciociola does not produce or sell any motorcycle parts nor does he mass-produce his ornamental designs. (DPFOF ¶ 123.) Ciociola's motorcycle artwork involves custom designs. (DPFOF ¶ 124.) Ciociola's works include many different designs, including cartoon characters, feathers, eagles, dream catchers, flames, wizards and dragons. (DPFOF ¶ 126.)

Ciociola admits that he paints Harley-Davidson trademarks and logos on motorcycles, and even advertises this service on his website. (DPFOF ¶ 127.) Ciociola cannot identify a single instance in which he has painted a scarecrow as the primary image on a gas tank, but would do so if

5

a customer requested one. (DPFOF ¶ 128; Hartmann Aff., Ex. H, Ciociola Dep. I 40:2-9, 41:19-42:16, 109:17-111:4.)

Ciociola's use of an image of a scarecrow in advertising takes several forms. (DPFOF ¶ 133.) The most frequent design that Ciociola uses for advertising purposes is a "Painting Scarecrow" figure which is hunched over a group of paint cans. (DPFOF ¶ 134.) Ciociola supplies this "Painting Scarecrow" image to dealers, and uses it on his business cards, and on his shirts and working clothes. (DPFOF ¶ 135.) Some of Ciociola's business cards show other similar scarecrow figures, and some do not contain a scarecrow figure at all. (DPFOF ¶ 136.) The "Painting Scarecrow" is also the central image on the home page of Ciociola's website. (DPFOF ¶ 137.) At certain rally appearances, Ciociola hangs a large, yellow banner with a "Standing Scarecrow" image. (DPFOF ¶ 138.)

Regardless of the posture of the scarecrow image used by Ciociola, it is always depicted in clothing of bright primary colors and facial features, including eyes, nose, and a smiling mouth. (DPFOF ¶ 139.) Ciociola sometimes places a small scarecrow in the ornamental designs that he paints on motorcycles. (DPFOF ¶ 140.) These ornamental scarecrows feature elements consistent with those scarecrow images that Ciociola uses in advertising in that they are multi-colored, are always smiling, and have two eyes, a nose, and a mouth. (DPFOF ¶ 141.) Ciociola's ornamental scarecrows are not the primary figure in his designs, instead, these little scarecrows are frequently depicted interacting with the subject of the artwork or other features of the motorcycle, such as pulling on an eagle's feathers (EC0282) or leaning on a Harley-Davidson® emblem (EC0279). (DPFOF ¶ 142; Hartmann Aff., Ex. P , EC0255, EC0271-87.)

Before filing this lawsuit, Ciociola filed an application for a "Scarecrow" mark design with the United States Patent and Trademark Office ("USPTO"). (DPFOF ¶ 143.) The USPTO issued

6

an office action requesting additional details from Ciociola, including a "concise description of the mark" (DPFOF ¶ 144.) Ciociola abandoned the application for his "Scarecrow" design mark at the advice of his attorney. (DPFOF ¶ 145.)

One category of motorcycle accessories offered to dealers by Harley-Davidson, the Color Shop, includes custom paint accessory collections (it also includes wheels). (DPFOF ¶ 22.) One of Harley-Davidson's custom paint collections includes Radical Paint Sets, a coordinated set of replacement gas tanks, fenders, and other motorcycle parts designed as a unit to depict a theme. (DPFOF ¶ 23.) These Radical Paint Sets are created and designed for a specific Harley-Davidson® motorcycle model and model year. (DPFOF ¶ 24.) Each Radical Paint Set is produced in a limited edition, meaning that, at most, only a predetermined number of each set will be produced. (DPFOF ¶ 25.)

Harley-Davison only sells Radical Paint Sets to its dealers, who then can sell them to customers. (DPFOF ¶ 26.) Harley-Davidson has two dealer meetings each year. (DPFOF ¶ 27.) At each of its bi-annual dealer meetings, Harley-Davidson typically introduces 14 to 20 new Radical Paint Sets. (DPFOF ¶ 28.) Dealers are given a "New Products" catalog from which to order the newly introduced paint sets. (PPFOF ¶ 36.) The paint sets are then listed in a yearly Parts and Accessories catalog sent to all dealers whether or not they attended the dealer show. (PPFOF ¶ 37.)

Harley-Davidson's Color Shop determines the motorcycles for which Radical Paint Sets will be offered and works up the designs and graphics and maximum number that can be produced for each Radical Paint Set in advance of the dealer meetings. (DPFOF ¶ 29.) The Radical Paint Sets themselves are manufactured by third-party vendors. (DPFOF ¶ 30.) Ideas for the Radical Paint Set designs originate either from within Harley-Davidson, either from the Color Shop or from the Styling

7

department (which is responsible for the overall look of Harley-Davidson® motorcycles), or may be suggested by the vendors. (DPFOF ¶ 31.)

The images on Radical Paint sets frequently depict skulls and flames, which are popular designs for Harley-Davidson motorcycles. (DPFOF ¶ 32.) Harley-Davidson searches for and uses images consistent with the Harley-Davidson mystique invoking power, freedom, back-road America and excitement. (DPFOF ¶ 33.)

Within each bi-annual Radical Paint Set collection, Harley-Davidson designs a range of different motifs. (DPFOF ¶ 34.) Once the design concept is determined for a specific Radical Paint Set, either Harley-Davidson or the vendor prepares a sample on paper, computer images, or a painted gas tank. (DPFOF ¶ 35.) After the initial design is completed, the design is reviewed by Harley-Davidson's Styling department. (DPFOF ¶ 36.) The Styling Department would approve designs, suggest changes to designs, or reject designs. (DPFOF ¶ 37.) After Color Shop makes any changes requested by Styling, the designs get Styling's final approval, and Harley-Davidson works with the vendors to finalize the details required to accommodate the production process and costs associated with a specific set. (DPFOF ¶ 38.) Ultimately the vendor creates the production sets of the Radical Paint Set-up to the maximum predetermined number for that design, individually numbers each set, and ships the Radical Paint Sets to those Harley-Davidson® dealers who place orders. (DPFOF ¶ 39.)

Harley-Davidson introduces samples of the Radical Paint Sets at its bi-annual dealer meetings. (DPFOF ¶ 40.) Following a dealer meeting, dealers have a short period afterwards (less than three weeks) to place orders after which time this window closes, the dealers can no longer order the Radical Paint Sets. (DPFOF ¶ 44.) To introduce a new Radical Paint Set collection to the public,

Harley-Davidson includes photos of the collection in the first annual or supplemental P & A Catalog following the dealer meeting when the collection is introduced. (DPFOF ¶ 47.) Harley-Davidson may also display the sample motorcycles displaying the Radical Paint Sets at certain consumer events or rallies (such as the Sturgis rally). (DPFOF ¶ 48.) Harley-Davidson® owners can only buy a Radical Paint Set from a dealer. (DPFOF ¶ 49.) If a dealer does not have or cannot locate the Radical Paint Set from another dealer, the consumer will not be able purchase that product from a dealer. (DPFOF ¶ 50.)

In its 2006 Genuine Motor Accessories and Genuine Motor Parts Catalog ("2006 P & A Catalog"), Harley-Davidson included a paint set called "Radical Paint Set for Softail® FX Springer® Models - Scarecrow, Black and Blue" ("Scarecrow, Black and Blue" or "'Scarecrow, Black and Blue' Radical Paint Set"). (DPFOF ¶ 8.) The 2006 P & A Catalog was available during the period Fall 2005 through early 2006. (DPFOF ¶ 94.) The "Scarecrow, Black and Blue" Radical Paint Set was offered as a one-time limited edition. (PPFOF ¶ 39.) Dealers wishing to order one or more "Scarecrow, Black and Blue" Radical Paint Sets were required to place their orders within two weeks of the conclusion of the Denver dealer show in July 2005. (PPFOF ¶ 40.)

In its 2006 P & A Catalog, Harley-Davidson included nineteen (19) Radical Paint Sets, and two (2) Exotic Paint Sets. (DPFOF ¶ 95.) Other paint sets among those in the 2006 P & A Catalog were named "Exotic Paint Set for Softail® Standard and Night Train® Models - Alien Spider, Candy Blue;" "Radical Paint Set for Sportster® Standard Models - Electric, Red and Black Flames and Lightning Bolt;" "Radical Custom Sheet Metal Set for Fat Boy Models - 3-D Flame, Metallic Blue with Blue Pinstripe;" "Gambler, Gold and Black;" "Venom, Yellow with Blue Flame;" "Villain,

9

Black and Red;" and "Sneaky, Red on Blue;" (DPFOF ¶ 97; Hartmann Aff., Ex. D; Pl.'s Resp. to DPFOF ¶ 69; Hartmann Aff., Ex. D.)

The ad copy for the "Scarecrow, Black and Blue" Radical Paint Set as printed in the 2006 P & A Catalog, and other related materials, was: "Good for keeping away pests. Especially minivans. With a hardcore black and blue color scheme, your Softail FX Springer motorcycle will have no problems keeping conformity at bay. The miniature chrome 'Bar & Shield' logo authenticates the special design, and only 150 hand-numbered sets are available. (Available October, 2005.)" (DPFOF ¶ 9; Hartmann Aff., Ex. D, H0022.)

The plaintiff acknowledges that the 2006 P & A Catalog is "advertising for the ["Scarecrow, Black and Blue" gas] tank. It describes the tank. It's a written description of a visual object. It's related." (DPFOF ¶ 10; Harmann Aff. Ex. I, Ciociola Dep. II 23:1-4.)   The plaintiff also acknowledges that the "Bar & Shield" logo is a trademark associated with Harley-Davidson. (DPFOF ¶ 11; Hartmann Aff., Ex. H, Ciociola Dep. I 112:18-24, 125:24-136:9.)

The "Scarecrow, Black and Blue" Radical Paint Set includes a gas tank in which the silhouette of a standing scarecrow is painted against a blue and black background, surrounded by a drawing of barbed wire. The words "Harley-Davidson" arch over the head of the scarecrow, and there is a small "Bar & Shield" on the left side of the image.[4]  (DPFOF ¶ 13; Hartmann Aff., Ex. D, H0023; AH Aff. Ex. E .)

The gas tank for each of the Radical Paint Sets in the 2006 P & A Catalog includes either a Harley-Davidson logo or the words "Harley-Davidson." (DPFOF ¶ 100.) The Plaintiff admitted that

---

[4]In order to aid the reader in visualizing the "Scarecrow, Black and Blue" Radical Paint Set, a picture of the "Scarecrow, Black and Blue" Radical Paint Set can be found in Appendix 2.

10

he expected consumers would know that the "Scarecrow, Black and Blue" Radical Paint Set was produced by Harley-Davidson, as stated in his deposition:

> A.      You need to understand Harley-Davidson, Albert.  People know what their Radical Paint Sets look like.  They're identified by a trademark in the corner.  It's not hard.
>
> Q.      You mean the bar and shield?
>
> A.      That's a trademark, correct.
>
> Q.      I just want to make sure we're talking about the same trademark.  That's something that you think people know what that is when they see it?
>
> A.      Albert, the tank says "Harley-Davidson" on the side.
>
> Q.      The tank, you mean?
>
> A.      Yeah.  Doesn't it?
>
> Q.      To my recollection, it does.
>
> A.      A trademark.

(DPFOF ¶ 105; Hartmann Aff., Ex. I, Ciociola Dep. II 36:4-20.)

The "Scarecrow, Black and Blue" Radical Paint Set was introduced to dealers in 2005. (DPFOF ¶ 51.)  Harley-Davidson began to work on the "Scarecrow, Black and Blue" Radical Paint Set, as well as the other Radical Paint Sets introduced at the same dealer meeting, in 2004.  (DPFOF ¶ 52.)

New paint sets are physically displayed at the dealer shows, together with a "hang tag" describing the paint set.  (PPFOF ¶ 34.)  The "hang tag" is 4 to 6 feet high and is displayed over or near each paint set.  (PPFOF ¶ 35.)  The "Scarecrow, Black and Blue" Radical Paint Set, together

11

with its hang tag, were displayed at the Harley-Davidson sponsored rally in Sturgis, South Dakota in August 2005. (PPFOF ¶ 38.)

The "Scarecrow, Black and Blue" Radical Paint Set was conceived and designed internally at Harley-Davidson by David Braun ("Braun") and Donnie Cunningham ("Cunningham"). (DPFOF ¶ 53.) Braun was formerly employed by Harley-Davidson as a Category Manager for the Color Shop category in Harley-Davidson's Accessories division. (DPFOF ¶ 54.) Cunningham was a former contractor of Harley-Davidson in the Color Shop category in Harley-Davidson's Accessories division. (DPFOF ¶ 55.) The inspiration for the design started with an old advertisement used by Harley-Davidson which included a scarecrow image. (DPFOF ¶ 56.)

During his deposition, Braun described how he arrived at the idea for the "Scarecrow, Black and Blue" design as follows:

> So, for going through our product plan, we wanted to do a scarecrow because when you think of, like we were saying before, you are always looking for something different besides skulls and flames, and paging through magazines I came across a real cool Harley-Davidson ad showing I think a, I don't have that ad in front of me, but from my memory, it was like a green and blue flame job on a Road King, and it was in the country scene where there was a scarecrow in the background on a rolling hill.

> And I am an avid motorcycle rider and I love taking back roads, and scarecrows have that little bit of an evil edge to it, and it's also got the aspect of the open road to it, because when you are driving along the country road, you have all the barbed wire fences from the farms and you will see a scarecrow every once in a while. And so it's part of the whole image of Harley of that open road feeling, a little edge to it, but it's also feeling of Americana.

> And so, I was like, wow, this is something that we have never done before. I saw that ad and I literally just physically ripped it out of the ad and I handed it to Donnie and was like, Donnie, let's do a scarecrow design. Here's a piece of, here's an image for your design influence. And then from there, you know, he sits by himself and he went to work and he came up with the reiteration.

12

(DPFOF ¶ 57; Hartmann Aff., Ex. X, Braun Dep. 31:24-33:4.)

Cunningham incorporated barbed wire to frame his design, using as a model the barbed wire which he has tattooed on his arm. (DPFOF ¶ 59.) Barbed wire is associated with Harley-Davidson and Harley-Davidson® riders: "barbed wire is that, kind of has that edge, you know, you see a lot of Harley riders with tattoos of barbed wire going around their biceps. As well as you see a lot of decals in the marketplace and so barbed wire is a kind of common theme that you see within the Harley culture." (DPFOF ¶ 60; Hartmann Aff., Ex. X, Braun Dep. 55:19-56:1.)

Cunningham next searched on Google Images for a scarecrow pattern and located an image of a Halloween costume that he reduced to a dark silhouette with no details. (DPFOF ¶ 61.) When asked to describe the overall development process, for the "Scarecrow, Black and Blue" design, Cunningham testified as follows:

> I started out with a blank tank on hard file, meaning piece of paper, just -- and then would pencil sketch. I believe I pencil sketched the barbed wire first and then went online and looked up -- you know, typed in -- went to Google, typed in scarecrows, and then I went to images and looked up whatever images just to see what was out there as far as, you know, scarecrow ideas. Nothing really popped up. There was very few pictures.

> I remember there was one that was like a costume from like a costume store. I remember grabbing that one and showing that to Dave [Braun] saying, hey, is this something, you know, that you want me to do. But given the way the paint lays down and how the process of the tanks are painted, it didn't matter what the actual image looked like because they weren't going to paint, you know, straw coming out of -- it's just going to be a silhouette.

> So basically I had to find, you know, the shape and, you know, the style hats that they wore, clothing that they wore; if there was a stick standing up above their head or below their head, how they kind of stood out in the field. So I just took that one that was from the costume place, showed that to Dave. He said yes.

> So then I pencil-sketched, you know, the shape of the scarecrow that you see here on the tank and then airbrushed it in the computer. I think the whole set was done -- I

13

probably did that whole bike in maybe an hour, two hours. Because with the -- you know, the silhouette, basically I just take that outline, scan it in, the pencil sketch, trace it in Photo Shop, place it on there, you know, put a color over the top of it. So it didn't take much time at all.

(DPFOF ¶ 68; Hartmann Aff., Ex. T, Cunningham Dep. 19:14-21:5.)

Braun was ultimately responsible for approving the name for the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF ¶ 70; Hartmann Aff., Ex. X, Braun Dep. 46:3-7.) Braun testified that the his team came up with the name "Scarecrow, Black and Blue." (PPFOF ¶ 48; Def.'s Resp. to PPFOF ¶ 48.) When asked about the process for naming the "Scarecrow, Black and Blue" Paint Set, Braun testified as follows:

What we always tried to do is name it to match the description from a marketable standpoint because, obviously, it's got a scarecrow on it with barbed wire so it makes sense to call it that. So from one, you want to name something that is descriptive to match the character of the design.

And then we will add, sometimes, the color prefix after it to help, you know, further make it more understandable. Black and blue is the color of the tank. It's black and blue and it's a scarecrow, so that's how we code things.

(DPFOF ¶ 71; Hartmann Aff., Ex. X, Braun Dep. 46:11-22.)

Before this lawsuit, neither Braun nor Cunningham had heard of Plaintiff. (DPFOF ¶ 76.) The parties dispute whether any of the other Harley-Davidson employees involved in the conception or execution of the "Scarecrow, Black and Blue" Radical Paint Set, including the manager of Harley-Davidson's Accessories department, Paul Wiers, had heard of the plaintiff. (DPFOF ¶ 77; Plaintiff's Resp. to DPFOF ¶ 77.) Both parties agree that after the design was already created, the Director of Styling, Ray Drea, recalls an employee of the Styling department, Paul Martin, mentioning a motorcycle "pinstriper" named "scarecrow." (DPFOF ¶ 78; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.) At his deposition, Drea testified:

14

Q.      Were you at any time aware of Scarecrow Ed Ciociola prior to this litigation?

A.      No.  No, that's not true.  I did after when we were doing design, and this is where it gets fuzzy for me, after the design was completed - -

Q.      Design on the Scarecrow Black and Blue?

A.      Yeah, meaning approved, that okay, we're going to go to paint, we're going to put this into production.  And I can't remember if it was just prior to going into production or after it was in production that at that time Paul Martin had said to me hey, did you know that there is a pinstriper that goes by the name of Scarecrow.

. . .

Q.      So who would have heard Paul's comment about Scarecrow the pinstriper?

A.      The way I'm remembering it is that Dave Keene, Dave Braun and Donnie may have been there, but the other two I believe were there.

(Plaintiff's Resp. to DPFOF ¶ 77; Drea Dep. 16:22-17:9, 27:11-15.)

As Drea remembered the conversation with Martin, Martin did not provide Drea with any details of the artist's work during this conversation. (DPFOF ¶ 79; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.)  Drea had not heard of a motorcycle artist named "scarecrow" before that conversation. (DPFOF ¶ 80; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.)  Drea did not share Martin's comment with anybody in the Accessories division. (DPFOF ¶ 85; Hartmann Aff., Ex. DD, Drea Dep. 27:11-24.)

Gene Ostrum ("Ostrum"), Director of Field Sales, Operations and Strategy for North America, has known Ciociola as "Scarecrow" for over 20 years.  (PPFOF ¶¶ 16-17.)  Ostrum usually meets Ciociola yearly at either a rally or dealer event.  Ciociola has been providing painting and pinstriping services as a vendor when Ostrum has seen him.  Ostrum has seen Ciociola at Harley-Davidson's Sturgis event 3 or 4 times.  (PPFOF ¶ 17.)

15

Ostrom was the Field Sales Manager for North America during the development of the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF ¶ 87). Ostrom had no knowledge of "Scarecrow, Black and Blue" Radical Paint Set, and had not even seen a picture of it, until approximately one week before his deposition. (DPFOF ¶ 88.)[5] Ostrom never mentioned Plaintiff or his artwork to anybody in the Harley-Davidson Accessories or Styling departments. (DPFOF ¶ 89.)

The parties dispute whether Ciociola met other Harley-Davidson personnel at Harley sponsored/sanctioned events.[6] (PPFOF ¶ 15; Def.'s Resp. to PPFOF ¶ 15.)

Platinum One manufactured the "Scarecrow, Black and Blue" Radical Paint Set for Harley-Davidson. (DPFOF ¶ 90.) Platinum One shipped the "Scarecrow, Black and Blue" Radical Paint Sets to Harley-Davidson's dealers. (DPFOF ¶ 91.) Platinum One shipped only 105 "Scarecrow, Black and Blue" Radical Paint Sets to Harley-Davidson dealers. (DPFOF ¶ 92.)

Employees of H-D, Inc. did not conceive or initiate the design for the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF ¶ 108.) Employees of H-D, Inc. did not participate in communications regarding the commercial development of the "Scarecrow, Black and Blue" Radical

---

[5] The plaintiff notes that Ostrum attended the Harley-Davidson Dealer's show in Denver in July 2005, and may have attended the Sturgis rally in South Dakota the following month. The "Scarecrow, Black and Blue" Radical Paint Set with the accompanying description placard were displayed at both events. (Plaintiff's Resp. to DPFOF ¶ 88.)

[6] Ciociola asserts that he met Jim Ziemer, President and CEO, at the National H.O.G. Rally in Chattanooga, TN in August 2005; Willie G. Davidson, Sr., Vice President, in Rapid City, SD in August 2002; Ruth Crowley at the National H.O.G. Rally in Chattanooga, TN in August 2005; Julie, Harley-Davidson designer, at the H-D Fall Ride in Tomahawk, WI in September 2005; Gene Ostrum, Director of Field Sales, Operations and Strategy for North America, in Rapid City, SD in August 2004; Mavis Feldpausch at a York PA rally; and Pam Hahn at a Tomahawk, WI rally. (PPFOF ¶ 15.)

16

Paint Set. (DPFOF ¶ 109)  Employees of H-D, Inc. did not draw or create any artwork or designs which were incorporated into the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF ¶ 110.)

Harley-Davidson had not produced a paint set depicting or referencing a scarecrow for at least ten years before offering the "Scarecrow, Black and Blue" Radical Paint Set in 2005, nor has it produced or offered such a paint since. (PPFOF ¶ 41.) Harley-Davidson has not incorporated barbed wire in a paint set design since production of the "Scarecrow, Black and Blue" Radical Paint Set. (PPFOF ¶ 43.) Harley-Davidson had incorporated barbed wire in the design of a paint set on one occasion in the past ten years, in January 2004. (PPFOF ¶ 44; Def.'s Resp. to PPFOF ¶ 44.) Ciociola first painted barbed wire on a car in the 1980's, and on motorcycles in 1997 or 1998. (PPFOF ¶ 47.)

The 2006 Parts and Accessories Catalog depicting the "Scarecrow, Black and Blue" Radical Paint Set also listed an optional seat which could be purchased to accompany the Scarecrow paint set. The seat was black with a barbed wire outline, and did not contain a scarecrow graphic. The copy adjacent to the picture of the seat provides, in pertinent part:

> **Sidekick Seat for Softail Models -**
> **Scarecrow Pattern**
> Styled to match the Scarecrow Radical Paint Set, the color matched stitch pattern on the premium cowhide seating surface mirrors the bike's graphics for a true custom look.

(PPFOF ¶ 45; Hartmann Aff., Ex. D, HOO22.)

Prospective names for products developed by Harley-Davidson's Color Shop (including paint sets) are submitted to HD Michigan, Inc., a wholly owned subsidiary of Harley-Davidson, for product name clearance. (PPFOF ¶ 49.) HD Michigan, Inc. owns all Harley-Davidson trademarks. (PPFOF ¶ 50.) HD Michigan, Inc.'s four employees and two contractors are licensed attorneys. (PPFOF ¶¶ 51-52.) The employees of HD Michigan, Inc. conduct clearance searches for new product names.

17

(PPFOF ¶ 54.)  No written or formal protocol exists at HD Michigan, Inc. which its attorneys are required to follow in conducting new product name clearance searches.  (PPFOF ¶ 55; Def.'s Resp. to PPFOF ¶ 55.)

HD Michigan, Inc. does not maintain a data base of Harley-Davidson vendors' names or vendors' product names to use when conducting new product name clearance searches.  (PPFOF ¶ 57; Def.'s Resp. to PPFOF ¶ 57.)  Following a product name clearance search the attorney will prepare a report which contains legal opinions and advice concerning the use of a proposed product name.  (PPFOF ¶ 58; Def.'s Resp. to PPFOF ¶ 58.)  Attorney Jennifer Anderson ("Anderson") conducted the clearance search for the "Scarecrow, Black and Blue" Radical Paint Set.  (PPFOF ¶ 59.)  Harley-Davidson has refused to produce Anderson's clearance search report or related documents, invoking the attorney-client privilege.  (PPFOF ¶ 60.)

## II.  SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)).  "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

18

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

19

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

In his complaint, Ciociola asserts that the defendants' use of his unregistered "Scarecrow" service marks violates §43(a) of the Lanham Act.  The infringement of an unregistered mark is actionable under § 43(a) of the Lanham Act:

(a) Civil action.

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a); *see also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 435 (7th Cir. 1999).

In order to prevail on a Lanham Act claim, "a plaintiff must establish that (1) [his] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chicago Tribune Co.*, 267 F.3d. 628, 638 (7th Cir. 2001) (citing *Eli Lilly & Co. v.*

20

*Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)). Plaintiffs must establish these two elements for both trademark infringement and unfair competition claims. *Packman*, 267 F.3d at 638; *see also International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988) (outlining the same two prong test for a § 43(a) claim).

In addition to contesting the validity of the mark, the defendant may invoke the "fair use" defense by showing that the alleged infringement "'is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . .'" *Id.* at 639 (quoting 15 U.S.C. § 1115(b)(4)). "This defense 'is based on the principle that no one should be able to appropriate descriptive language through trademark registration.'" *Id.* (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir. 1992)).

"In a trademark infringement case, . . . the determination that a defendant's use was a non-trademark use in good faith, and the finding that consumers are not likely to be confused about the origin of a defendant's products are questions of fact." *Packman*, 267 F.3d at 637. However, "these issues may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Id.* (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

Here, the defendants concede that there are issues of fact as to whether Ciociola has a valid design mark, and as to what comprises Ciociola's mark. However, the defendants argue that the evidence supporting their fair use defense, as well as the lack of evidence as to likelihood of confusion, are so overwhelmingly one sided that summary judgment is appropriate.

21

**A. Fair Use**

In order to prevail on a fair use defense, the defendants must show that: "(1) they used [the term "Scarecrow" and the scarecrow image ] in a non-trademark use; (2) the phrase [or image] is descriptive of their goods or services; and (3) they used the phrase [or image] 'fairly and in good faith' only to describe their goods or services." *Packman*, 267 F.3d at 639 (citing 15 U.S.C. § 1115(b)(4)).

**a. Non-Trademark Use**

In determining whether a term was used in a trademark use, the key question is whether the term was used to identify the source of the products. *See Packman,* 267 F.3d at 640 (the phrase "The joy of six" did not identify the source of any of the defendants' memorabilia so defendants' use was "otherwise than as a trademark"); *M. B. H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980) (radio station's call letters and frequency, not the slogan, identified the source of advertising); *Platinum Home Mortg. Corp. v. Platinum Fin. Group*, 149 F.3d 722, 728 (7th Cir. 1998) ("platinum" described quality of mortgage services and did not identify particular source or designate specific origin of services).

The defendants argue that the prominent use of Harley-Davidson's well-recognized trademarks in the paint set design and the ad copy describing the product eliminate any argument that the scarecrow image or the word "Scarecrow" would be understood by consumers as source identifiers. Specifically, the defendants note that the words "Harley-Davidson" are emblazoned above the figure of the scarecrow in the "Scarecrow, Black and Blue" Radical Paint Set, which is the mark under which Harley-Davidson has sold its motorcycles and accessories for over 100 years.

22

Moreover, the defendants note that Harley-Davidson places its "Bar & Shield" logo in the corner of the gas tank nearest where the rider sits.

In support of their contention that they are using the term "Scarecrow" or scarecrow image in a non-trademark sense, the defendants cite to *Packman*, in which the Seventh Circuit found that the Chicago Tribune ("Tribune") used the plaintiff's registered trademark in a non-trademark use. 267 F.3d at 640. In *Packman*, the plaintiff held federal and Illinois trademarks for the phrase "the joy of six," for use in relation to basketball and football games. *Id*. at 633. The plaintiff alleged that the Tribune infringed on this trademark when it reproduced its front page, which included the headline "The joy of six," onto promotional memorabilia. *Id*. at 635.

In concluding that the Tribune's use of "The joy of six" was a non-trademark use, the court noted that the Tribune's distinctive masthead, which appeared prominently on the front page, on all of the memorabilia containing the phrase, and on one side of the products' tags, plainly identified that the Tribune was the source of the products. *Id*. at 639. The court also noted that the Tribune's use of its well-known masthead identified the phrase as a newspaper headline, and not as a Tribune trademark. *Id*.

The court in *Packman* also cited *Sunmark, Inc. v. Ocean Spray Cranberries, Inc*., 64 F.3d 1055, 1060 (7th Cir. 1995) in support. In *Sunmar*k, the court held that Ocean Spray did not infringe upon the plaintiff's registered trademark "*Swee*TARTS" by using the phrase "sweet-tart" to describe its juice drinks. The court in *Sunmark* noted that Ocean Spray had not claimed exclusive use of the phrase "sweet-tart" and thus could not object if other makers of juice used it. *Id*. at 1059.

The court in *Packman* contrasted the situation in that case to that found in *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992). In *Sands*, the court found that the fair

23

use defense was inapplicable because the defendant's slogan, "Gatorade is Thirst-Aid," used the plaintiff's "Thirst-Aid" mark as a trademark. *Id.* at 954. In reaching this conclusion, the court noted that the slogan "Thirst-Aid" appeared more prominently than "Gatorade" in the advertisements, and that the rhyming of "Gatorade" and "Thirst-Aid" created a "memorable slogan . . . uniquely associated" with the defendant's "Gatorade" product. *Id.*

In response, Ciociola argues that the facts in *Packman* are distinguishable from the facts in the case at hand. Specifically, the plaintiff argues that *Packman* involved a "straight-up trademark infringement case," and that in contrast this case presents a § 43(a) claim.[7] (Pl.'s Resp. Br. at 31.) Ciociola contends that the plaintiff in *Packman* did not argue that the public was confused as to the plaintiff's affiliation with or endorsement of the Tribune's t-shirts that contained the reproduction of the newspaper's front page. Moreover, according to Ciociola, in contrast to the case at hand, the plaintiff in *Packman* did not present evidence of actual confusion or secondary meaning. (Pl.'s Resp. Br. at 31-32.)

As an initial matter, regardless of whether a suit is brought under 15 U.S.C. § 1114 for trademark infringement, or under § 43(a) for unfair competition, the analysis of the applicability of the fair use defense is identical. The defendant must meet the same three prongs in both types of cases in order to prevail on a fair use defense.[8] Indeed, it would seem nonsensical if a defendant invoking the fair use defense was under a greater burden in cases involving unregistered trademarks

---

[7]However, the plaintiff in *Packman* did not only bring a claim under § 1114, but also brought a claim under § 43(a).

[8]As noted above, in order to prevail on a Lanham Act claim under either § 1114 or § 43(a), "a plaintiff must establish that (1) [his] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman*, 267 F.3d. at 638; *see also International Kennel Club,* 846 F.2d at 1084.

rather than registered trademarks, given that registered trademarks are afforded presumptions of validity under the Lanham Act.

Moreover, the defendants need not negate confusion in order to prevail on a fair use defense. As held by the Supreme Court, "the fair use defendant has no free-standing need to show confusion unlikely." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004). In reaching this conclusion, the Supreme Court noted that "[t]he common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *Id.* at 122. Moreover, the Supreme Court noted that placing a burden on the defendant to show nonconfusion would be incoherent because "it is only when a plaintiff has shown likely confusion by a preponderance of the evidence that a defendant could have any need" for the fair use defense. *Id.* at 120.[9] Such being the case, even if the plaintiff has evidence of actual confusion, a

---

[9]As noted by the plaintiff, the court in *Sunmark* stated that,

> When the products involved are similar, 'likelihood of confusion' may amount to using a word in a 'misleading' way, violating 15 U.S.C. § 1125(a)(1)--not because the likelihood of confusion makes the use nondescriptive, but because the confusion about the product's source shows that the words are being used, de facto, as a mark. And the defense is available only to one who uses the words of description 'otherwise than as a mark.'

64 F.3d at 1059.

However, the court also noted that the "'use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin of the product'" *Id.* (quoting *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528 (1924); *see also KP Permanent Make-Up*, 543 U.S. at 119 ("these cases are consistent with taking account of the likelihood of consumer confusion as one consideration in deciding whether a use is fair . . . [but] they do not stand for the proposition that an assessment of confusion alone may

25

showing of actual confusion is not dispositive on the issue of whether the defendant has used the term "Scarecrow" or the scarecrow image in a non-trademark sense.

The plaintiff also argues that the defendants are using "Scarecrow" as a trademark because this word is identical to the plaintiff's word mark. However, the similarity of the marks is not dispositive on the issue of whether the defendants were using a term in a trademark sense. The fair use defense can still be applicable when the defendants use a term identical to the plaintiff's mark. *See Sunmark*, 64 F.3d at 1059 (use of the phrase "sweet-tart" did not infringe upon the plaintiff's registered trademark "*Swee*TARTS").

As noted above, the key question is whether the term "Scarecrow," or the image of a scarecrow, was used to identify the source of the products. Although the similarity of the marks or the potential for consumers to be confused as to the source of the paint set are potential considerations, these factors are not dispositive on this question. After considering all the evidence in the light most favorable to the plaintiff, I conclude that the defendants did not use the scarecrow image or the term "Scarecrow" to identify the source of the products.

To begin with, the plaintiff has conceded that "[t]he scarecrow figure employed by Harley on the side of the gas tank of the paint set is distinguishable from Ciociola's scarecrow design mark." (Pl.'s Resp. Br. at 21.) Moreover, the plaintiff has admitted that he cannot identify a single instance in which he has painted a scarecrow as the primary image on a gas tank. (DPFOF ¶ 128.) The plaintiff cannot sustain his argument that, essentially, any paint set featuring an image of a scarecrow indicates that the plaintiff was the source of the work, especially when he has never painted a

_____

be dispositive.").

Case 2:06-cv-00255-WEC   Filed 04/24/08   Page 26 of 38   Document 57

scarecrow as a central figure. Simply stated, the evidence establishes that the defendants did not use the scarecrow image to identify the source of the products.

Moreover, given the prominence of Harley-Davidson's trademarks in the paint set design and the ad copy, as well as the defendants' use of the word "Scarecrow" in a descriptive sense, I conclude that the term "Scarecrow" was not used to identify the source of the products. The term "Scarecrow" was not used in a trademark sense, but rather in a descriptive sense to describe a particular product featuring a scarecrow originating from Harley-Davidson.

As noted above, the words "Harley-Davidson" are emblazoned above the figure of the scarecrow in the "Scarecrow, Black and Blue" Radical Paint Set. Harley-Davidson has sold its motorcycles and accessories under this mark for over 100 years. Moreover, Harley-Davidson places its "Bar & Shield" logo in the corner of the gas tank nearest where the rider sits. The plaintiff concedes that this "Bar & Shield" logo is a recognizable trademark which identifies Harley-Davidson products. As the plaintiff testified:

> A. [Ciociola]   You need to understand Harley-Davidson, Albert. People know what their Radical Paint Sets look like. They're identified by a trademark in the corner. It's not hard.
>
> Q.      You mean the bar and shield?
>
> A.      That's a trademark, correct.

(Hartmann Aff. Ex. I, Ciociola Dep. II 36:4-20.)

In addition to being featured prominently on the gas tanks on which was painted the "Scarecrow, Black and Blue" design, these Harley-Davidson trademarks are also featured on the front of the catalog, and in the ad copy describing the paint set. Specifically, the ad copy states that "The miniature chrome 'Bar & Shield' logo authenticates the special design, and only 150 hand-numbered

27

sets are available." (DPFOF ¶ 9; Hartmann Aff., Ex. D, H0022.) The prominent use of Harley-Davidson's trademarks in the catalog clearly indicates that the products listed originate from Harley-Davidson.

Moreover, the word "Scarecrow" was not found on the gas tank, and was only used in the ad copy and hang tag in combination with Harley-Davidson trademarks. The term "Scarecrow" was not featured prominently in the ad copy or hang tag, and merely was used to identify one particular paint set. Indeed, the 2006 P & A Catalog contained 20 other paint sets, each with a different name. The name "Scarecrow, Black and Blue" was not featured any more prominently than any of the other names for the 20 paint sets. The plaintiff does not argue that it was unclear whether Harley-Davidson was the source for these other 20 paint sets.

Furthermore, the plaintiff's scarecrow design was not found on the gas tank, ad copy, or hang tag for the "Scarecrow, Black and Blue" paint set. As noted by the plaintiff, he places a version of his scarecrow design on every motorcycle he paints. (PPFOF ¶ 26.) Ciociola also attends every Harley-Davidson, H.O.G., and dealer event using the scarecrow design, and his booth for such events has always incorporated signs using both the scarecrow word and design. (PPFOF ¶ 18.) The complete absence of the plaintiff's scarecrow design, which he uses to identify that he is the source of the work, provides further support for a finding that Harley-Davidson identified itself, rather than the plaintiff, as the source of the product.

As with the prominent use of the Tribune's distinctive masthead in *Packman*, Harley-Davidson's prominent use of its distinctive trademarks identifies Harley-Davidson as the source of the products. The prominent use of these trademarks, along with the less prominent use of the term "Scarecrow," indicates that the term "Scarecrow" is only being used to identify one particular paint

28

set.[10]  As will be discussed below, rather than using the term "Scarecrow" in a trademark sense, the defendants are using the term "Scarecrow" to describe a paint set that features the image of a scarecrow.

**b. Descriptiveness of the Term "Scarecrow"**

A descriptive term imparts information directly or is "necessary to the description of the goods or services in question." *M.B.H. Enter.*, 633 F.2d at 54.  This is in contrast to "fanciful or coined devices, which are utterly undescriptive, and from 'suggestive' devices, which combine elements of descriptiveness and of fancy." *Id.*  If a mark "stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Platinum Home Mortg. Corp.*, 149 F.3d at 727 (quoting *Sands, Taylor & Wood Co.*, 978 F.2d at 947).  "A person 'cannot appropriate the English language' and thereby render others inarticulate." *Packman*, 267 F.3d at 641 (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986); *see also M.B.H. Enter.*, 633 F.2d at 55 (an owner of a registered mark "may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense").

The plaintiff argues that the word "Scarecrow" is not a descriptive term because it is not an adjective, and "is not descriptive of a set of fenders and a gas tank."  (Pl.'s Resp. Br. at 32.)  Moreover, the plaintiff argues that even considering the design of the "Scarecrow, Black and Blue"

---

[10]The plaintiff argues that "if one considers the totality of Harley's catalog advertisement concerning the Scarecrow, Black and Blue Paint Set, it is clear Harley used the term "Scarecrow" as a trademark, and not in a descriptive sense." (Pl.'s Resp. Br. at 33.)  However, the plaintiff does not provide any explanation for this conclusion.  Moreover, the plaintiff argues that the defendants' use of the term "Scarecrow" was misleading because it "did not refer to its product as 'black and blue scarecrow' but as "Scarecrow, Black and Blue." (Pl.'s Resp. Br. at 33.)  Again, the plaintiff does not explain how this is misleading as to the source of the product.

paint set, descriptive terms would include "shiny," "metallic," black," "blue," blue," "cheerful," "willowy," "a black and blue scarecrow," or "an outline of a scarecrow." (Pl.'s Resp. Br. at 32, 34.)

In my opinion, however, the term "Scarecrow" is descriptive of a paint set which features an image of a scarecrow. Indeed, it is difficult to understand how the term "Scarecrow" could not be considered descriptive of an image of a scarecrow. The scarecrow image is the dominant image in the "Scarecrow, Black and Blue" paint set, and describing it as "shiny" or "metallic" would provide a much less clear description of this image then simply describing it as a "Scarecrow." It is also unclear how "a black and blue scarecrow" would be more descriptive than "Scarecrow, Black and Blue."

Moreover, the catalog is selling paint designs for fenders and gas tanks. A description of the paint design would involve describing the actual paint design, not the shape and color of the fenders and gas tank. Indeed, the plaintiff himself states, in his brief in response, that "a customer looking at Harley's gas tank would most likely refer to it as the "Scarecrow" tank, given the scarecrow graphic on the side." (Pl. Resp. Br. at 21.) The plaintiff further states in his brief that "[a] picture of a scarecrow is called or referred to as "'scarecrow.'" *Id*.

The plaintiff also argues that "Scarecrow" is not descriptive because the term is used in the ad copy for a "Sidekick Seat" that goes along with the "Scarecrow, Black and Blue" paint set, and the "Sidekick Seat" does not contain an image of a scarecrow. However, the ad copy states that the Scarecrow Pattern is "styled to match the Scarecrow Radical Paint Set, the color matched stitch pattern on the premium cowhide seating surface mirrors the bike's graphics for a true custom look. (PPFOF ¶ 45; Hartmann Aff., Ex. D, HOO22.) The term "Scarecrow" is still referring to the "Scarecrow, Black and Blue" Radical Paint Set that contains an image of a scarecrow. The seat is

30

designed to match the paint set that contains an image of a scarecrow, and the ad copy for the seat is simply referring back to that particular paint set.

The plaintiff also notes that Harley-Davidson has a propensity for assigning fanciful names to its paint sets. In particular, the plaintiff notes that in the 2006 P & A catalog, at least 12 of the paint sets were named using whimsical or arbitrary terms, including "Gambler, Gold and Black," "Sneaky, Red on Blue," and "Villain, Black and Red." (Pl.'s Resp. to DPFOF ¶ 69.) "Villain, Black and Red" contains an image of skulls and bones, and "Sneaky, Red on Blue" contains an image of flames. However, the existence of some arbitrary names for certain designs does not impact whether other names in the catalog are, in fact, descriptive. The 2006 catalog also contains names such as "Alien Spider, Candy Blue," "Electric, Red and Black Flames and Lightning Bolt," and "3-D Flame, Metallic Blue with Blue Pinstripe." DPFOF ¶ 97.) These names describe the dominant image found in the paint set (i.e., an alien spider, red and black flames, and a 3-D flame), and are not arbitrary. Likewise, the name "Scarecrow, Black and Blue" is descriptive of a black and blue scarecrow.

The plaintiff further argues that, unlike the plaintiff in *Packman*, he has presented evidence that his "Scarecrow" mark has acquired secondary meaning. *See* 267 F.3d at 641 (finding that the phrase was descriptive in part because the record lacked any evidence that phrase had acquired a secondary meaning as used by the plaintiff). "Secondary meaning exists 'only if most consumers have come to think of the word not as descriptive at all but as the name of the product.'" *Packman*, 267 F. 3d at 639 (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986). "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that

31

those goods or services are the company's trademark." *Id*. at 641 (citing 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 15:5, at 15-9 (4th ed. 2001)).

Here, it is conceivable that some consumers might think of the plaintiff's "Scarecrow" mark as representing the plaintiff's pinstriping, detailing, and painting services. However, the owner of a mark that has acquired secondary meaning does not acquire an exclusive right "in the original, descriptive sense, but only in the secondary one associated with the markholder's goods." *KP Permanent Make-Up*, 543 U.S. at 122. As noted above, the word "Scarecrow" is not being used by the defendants to identify the plaintiff as the source of the paint design. Rather, the defendants are using the term in its original, descriptive sense; namely, to describe an image of a scarecrow.

Simply stated, the term "Scarecrow" is a term commonly used to describe an image of a scarecrow.[11]  The defendants used the term to describe an image of a scarecrow, which was distinguishable from the plaintiff's scarecrow design. The plaintiff cannot appropriate the term to himself and thereby prevent others from using the term in a descriptive sense, as the defendants did in this case. *See Packman*, 267 F.3d at 241.

### c. Good Faith

The plaintiff argues that his long and pervasive association with Harley-Davidson dealers, Harley-Davidson owners, Harley-Davidson executives, and Harley-Davidson rallies and events; the strength of his mark among Harley-Davidson enthusiasts; Harley-Davidson's awareness of a pinstriper named "Scarecrow" during the design approval process for the "Scarecrow, Black and Blue" Radical Paint Set; the use of "Scarecrow" in a non-descriptive manner; and Harley-Davidson's

---

[11]It is unnecessary to discuss whether the image of the scarecrow in the paint set meets the second prong of the fair use defense, as the image of the scarecrow is the product itself (and, in essence, descriptive of itself).

32

refusal to produce a trademark clearance report for the "Scarecrow" design are all evidence of the defendants' bad faith.

"Mere knowledge of [plaintiff's] trademark on the phrase is insufficient to establish that the [defendant] acted in bad faith and to preclude summary judgment." *Packman*, 267 F.3d at 642 (citing *M.B.H. Enter.*, 633 F.2d at 54). Rather, good faith "can be judged only by inquiry into [the defendant's] subjective purpose in using the [term]." *M.B.H. Enter.*, 633 F.2d at 54.

In *M.B.H. Enter.*, the plaintiff had a registered trademark for the phrase "I LOVE YOU" for services related to radio programs. 633 F.2d at 51. The plaintiff had licensed a promotion using the phrase "I LOVE YOU MILWAUKEE" to the radio station WISN in Milwaukee. *Id*. The defendant radio station WOKY began its own campaign, and used the phrases "WOKY LOVES MILWAUKEE" and "I LOVE MILWAUKEE." *Id*. at 52. In holding that WOKY did not act in bad faith, the court found that WOKY's use of its call letters and radio frequency to identify WOKY as the source in each of the ads suggested that WOKY did not intend to use the phrases as trademarks. *Id*. at 54-56; *see also Packman*, 267 F.3d at 642 (the presence of the Tribune's distinctive masthead above "The joy of six" headline and on every piece of memorabilia would not support an inference that the Tribune acted in bad faith).

Like the situations in *M.B.H. Enter.* and *Packman*, the defendants' prominent use of its distinctive Harley-Davidson trademarks on the paint design set, the ad copy, and catalog to indicate the source suggests a lack of intent to use the term "Scarecrow" as a trademark. Moreover, as discussed above, the term "Scarecrow" was only used in the ad copy and hang tags, and was not displayed any more prominently than the names of the other paint designs found in the catalog. Furthermore, as discussed above, the term "Scarecrow" was descriptive of the scarecrow image found

33

in the paint design. Finally, as discussed above, the image of the scarecrow was distinguishable from the plaintiff's design mark, and the plaintiff had never painted an image of a scarecrow as the central image. All of these factors support an inference that the defendants did not act in bad faith.

It is true that the plaintiff has provided some evidence that certain individuals at Harley-Davidson were aware of a pinstriper known as "Scarecrow." However, the plaintiff has not presented evidence that the two individuals who conceived and designed the "Scarecrow, Black and Blue" Radical Paint Set internally at Harley-Davidson, David Braun and Donnie Cunningham, were aware of the plaintiff. Braun was ultimately responsible for approving the name for the "Scarecrow, Black and Blue" Radical Paint Set, and testified that the his team came up with the name. (DPFOF ¶ 70; PPFOF ¶ 48). The only evidence the plaintiff offers that indicates that individuals from the design team were aware of "Scarecrow" is a conversation which occurred after the "Scarecrow, Black and Blue" paint set was created. (DPFOF ¶ 78, 81.) The other individuals identified by the plaintiff as being aware of his "Scarecrow" mark, such as Gene Ostrum, were not involved in the design process. (DPFOF ¶ 86-89.)

Moreover, even assuming that members of the Harley-Davidson design team were aware of "Scarecrow" and his work, this alone fails to establish that the defendants acted in bad faith. The plaintiff has not provided any additional evidence indicating that the defendants acted with bad faith or with the intent to confuse the public as to the origin of the "Scarecrow, Black and Blue" Radical Paint Set. Indeed, the plaintiff concedes that "[n]o Harley employee testified that the company named the Scarecrow paint set in a deliberate attempt to rip-off Ed Ciociola." (Pl.'s Resp. Br. at 27.) As noted above, mere knowledge of the plaintiff's mark is insufficient to establish that the defendants acted in bad faith and to preclude summary judgment.

34

Harley-Davidson's refusal to produce a "trademark" clearance report for the "Scarecrow" design due to attorney-client privilege is also not evidence of the defendants' bad faith. The plaintiff is merely speculating as to the content of an attorney-client communication, and the reason for the refusal to produce the report. At most, this may indicate that the defendants were aware of the "Scarecrow" mark when designing the paint set. Once again, however, this is insufficient to establish that the defendants acted in bad faith.

Moreover, the defendants have produced evidence that product names, including paint set names, are not treated as trademarks that will be used by Harley as a source identifier. Attorney Jennifer Anderson ("Anderson"), who conducted the clearance search for the "Scarecrow, Black and Blue" Radical Paint Set, testified that

> A.    If it's a trademark and it's going to be used by the company as a brand name, as a source identifier, and we're planning to seek protection and exclusivity . . . we will do a Thomson & Thomson search.
>
> Q.    . . . When don't you use Thomson?
>
> A.    When we have product names. And that might be from color shop, wheels, and paint set names.

(Hartmann Aff., Ex. HH, Ziegler Dep. 16:3-22.)

The plaintiff has not produced any evidence that would support an inference that the defendants acted in bad faith. Rather, the evidence indicates that the defendants used the name "Scarecrow, Black and Blue" to describe a paint set that featured the image of a scarecrow.

In sum, the evidence is so one-sided that there can be no doubt about whether the defendants' use of the term "Scarecrow" and the scarecrow image was fair use. The defendants' use of the term "Scarecrow" was a non-trademark use, in good faith, to describe a paint set featuring an image of a

35

scarecrow.  The plaintiff has failed to produce evidence creating a genuine issue of fact as to any of the three elements of the fair use defense.  Thus, the defendants' motion for summary judgment will be granted.

## B. Likelihood of Confusion

Given that the defendants have established that their use of the term "Scarecrow" and the scarecrow image was fair use, it is unnecessary to discuss the issue of likelihood of confusion.  The possible existence of confusion does not negate the establishment of the fair use defense.  Indeed, if the defendants' fair use of the term "Scarecrow" resulted in any confusion, "that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *KP Permanent Make-Up*, 543 U.S. at 122 (quoting *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*,125 F.3d 28, 30 (2nd Cir. 1997)).

## IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendants' motion for summary judgment will be granted because the plaintiff has failed to establish a genuine issue of material fact as to any of the three elements of the fair use defense.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**SO ORDERED** this 24th day of April 2008, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

36

**APPENDIX 1**



**APPENDIX 2**

